Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Monday, February 09, 2009 12:59:58 PM

THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOSEPH THOMAS SIEWICK | ) | |
| | ) | Case No. 06-57 |
| Debtor. | ) | |
| ———————————————— | ) | |
| | ) | |
| JOSEPH THOMAS SIEWICK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 06-216 |
| | ) | |
| BUFORD CLAYBORN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Buford Clayborn[1] filed a proof of claim in the Chapter 13 bankruptcy case of Joseph Thomas Siewick (the "Debtor"), seeking allowance of a $42,800 priority wage claim for work performed from September 15, 2004 to sometime in 2005. The Debtor objects to the proof of claim, and filed this adversary proceeding against Mr. Clayborn seeking money damages for Mr. Clayborn's alleged

---

[1] At all times in this adversary proceeding, Mr. Clayborn has appeared *pro se*. While *pro se* pleadings are viewed liberally, *Haines v. Kerner*, 404 U.S. 519, 520 (1972), a court is not required to develop the evidence on behalf of a *pro se* party at trial, to make substantive legal claims on behalf of a *pro se* party, or to otherwise actively aid a *pro se* party in trying a case. In this court's view, to do so would be to denigrate the judge's role as an impartial decision maker. *E.g.*, *Carnley v. Cochran*, 369 U.S. 506, 510 (1967) (noting that "the trial judge could not effectively discharge the roles of both judge and . . . counsel.").

breach of his employment agreement, which, in the Debtor's view caused his wholly owned business, Sheperdstown Hauling & Tree Service, Inc., to fail. The court consolidated both the Debtor's objection to Mr. Clayborn's proof of claim and the adversary proceeding for trial.

For the reasons stated herein, the court will disallow Mr. Clayborn's filed proof of claim, and order that any business records for Sheperdstown Hauling & Tree Service remaining with Mr. Clayborn be turned over to the Debtor. All other relief sought by the Debtor will be denied.

## I. BACKGROUND

The Debtor incorporated Sheperdstown Hauling & Tree Service, Inc., as a Subchapter "S" Corporation. The Debtor is its only member. In the fall of 2004 the Debtor spoke with Mr. Clayborn about problems he was having with the business, and he offered to make Mr. Clayborn the company manager. As part of the offer of employment, the Debtor said he would allow Mr. Clayborn and his wife to live with him in his home.

Before accepting a position as company manager, Mr. Clayborn wanted to be hired as a laborer on a temporary basis. Thus, on September 15, 2004, Mr. Clayborn began work as a temporary groundsperson earning $7.00 per hour. Mr. Clayborn stated that it took him less than three days to realize that the company's current employees were stealing from it.

At trial, Mr. Clayborn testified that he became the new manager of Sheperdstown Hauling & Tree Service on October 15, 2004. As the new manager, Mr. Clayborn was paid $10.00 per hour. Mr. Clayborn soon learned that the company's former manager was paid $20.00 per hour, and he wanted to be paid the same amount. The Debtor explained to Mr. Clayborn that he could be paid $20.00 per hour; however, it was Mr. Clayborn's responsibility to bid and price jobs such that the company could afford to pay his wages.

According to Mr. Clayborn, he began work as a $20.00 per hour employee on November 1, 2004. Because he claimed to work about 70 hours per week, Mr. Clayborn believed that his weekly salary was $1,400. Accordingly, after the first week of November 2004, Mr. Clayborn presented the Debtor with a wage claim for $1,400, and the Debtor paid it. After Mr. Clayborn's second week of employment, he again presented the Debtor with a $1,400 weekly wage claim. The Debtor issued a check for Mr. Clayborn's wages from the company's account, but the check was dishonored for insufficient funds.

The Debtor disputes that Mr. Clayborn ever had a weekly salary of $1,400. He testified that

Sheperdstown Hauling & Tree Service never had enough cash to pay an employee $1,400 per week (unless Mr. Clayborn had priced a job such that the company could afford the payment). In the Debtor's estimation, the company historically never grossed more than $5,000 to $6,000 a month, and it had up to $4,000 in expenses each month. In an effort not to alienate his new manager, however, the Debtor stated that he authorized the company to pay Mr. Clayborn $1,400 per week for the first two weeks of November, but, he informed Mr. Clayborn that his future wages would be based on company profits after expenses, which were to be split between himself and Mr. Clayborn on a 50-50 basis.

As a manager, Mr. Clayborn was responsible for the day-to-day operations of the company. He was to price jobs, prepare estimates, take customer phone calls, and manage other employees.[2] The Debtor, as owner, maintained check writing authority, paid for advertising, and was responsible for the payment of taxes. Although the Debtor showed Mr. Clayborn how to price jobs in a manner that would be profitable for the business, the Debtor stated that Mr. Clayborn did not follow his formula and repeatedly priced jobs too low. For example, Mr. Clayborn accepted work at a golf course that the company worked on for two weeks. The price Mr. Clayborn accepted was $1,000, which barely covered the costs of the equipment rental needed for the job, meaning that there was nothing left to pay the company's employees, including Mr. Clayborn.

By January 2005, the Debtor realized that Sheperdstown Hauling & Tree Service, Inc., was not making enough money to even pay its taxes. With no profits, the Debtor did not believe that Mr. Clayborn was entitled to any payment for his work. In February 2005, the Debtor stated that he told Mr. Clayborn that their arrangement was not working, and that the company was not making any money to pay its taxes. The Debtor believed that Mr. Clayborn's employment with the company

---

[2] The evidence at trial was sketchy with regard to how much work Mr. Clayborn and/or Sheperdstown Hauling & Tree Service performed from November 2004 through February 2005. Employee time sheets were not offered into evidence. Mr. Clayborn did offer an omnibus exhibit, Defendant's Exhibit 5, at the close of the trial, which consisted of approximately 182 pages of what appear to be a mix of invoices, cancelled checks, photocopied cash, and an on-going diary of Mr. Clayborn's spouse, who was not available to testify. At trial, the court provisionally denied admission to Defendant's Exhibit 5, pending a further, post-trial review. For the reasons stated by the court on the record, the court will deny admission to Defendant's Exhibit 5.

ended at that time.

Meanwhile, Mr. Clayborn continued to live with the Debtor in his home, and Mr. Clayborn continued to use the equipment of Sheperdstown Hauling & Tree Service to perform work. In April 2005, Mr. Clayborn worked for the Debtor's mother, and was paid for his services. About the same time, the Debtor stated that he began to fear for his personal safety, and he moved out of his house.

On May 3, 2005, the Debtor served Mr. Clayborn with a "No Trespassing" notice. Believing he was entitled to a large sum of unpaid wages, Mr. Clayborn refused to leave until he was paid. That same day, the Debtor filed a civil complaint requesting the issuance of a court order directing Mr. Clayborn to vacate his home. Mr. Clayborn answered the complaint, stating that he was owed $1,400 per week in wages, and he had a right to stay in the house as part of his employment agreement. Multiplying the legal proceedings between himself and the Debtor, Mr. Clayborn filed a May 24, 2005 complaint against the Debtor, personally, with the West Virginia Division of Labor for his unpaid wages.

On July 6, 2005, the Debtor and Mr. Clayborn agreed to mediate their dispute over Mr. Clayborn's continued occupation of the Debtor's home. The mediation agreement called for the Debtor to pay Mr.Clayborn $1,077 – representing the net amount of the dishonored paycheck owed to Mr. Clayborn from the second week of November 2004 – and Mr. Clayborn agreed to vacate the premises.

Although the Debtor paid Mr. Clayborn the $1,077, Mr. Clayborn failed to timely vacate the Debtor's home. On August 19, 2005, the Circuit Court of Jefferson County, West Virginia entered an order enforcing the parties' settlement agreement, and ordered Mr. Clayborn to vacate the Debtor's home by noon on August 24, 2005. Mr. Clayborn complied with this deadline, and, on November 9, 2005, the Circuit Court awarded the Debtor damages in the amount of $3,550 to compensate him for Mr. Clayborn's destruction of his property, conversion, and holdover rent.

The Debtor filed his February 13, 2006 bankruptcy petition before the West Virginia Division of Labor reached the merits of Mr. Clayborn's civil complaint for unpaid wages. That proceeding remains stayed due to the Debtor's bankruptcy filing.

## II. DISCUSSION

The three issues before the court are whether the Debtor owes money to Mr. Clayborn for

unpaid wages, whether Mr. Clayborn owes money to the Debtor for breach of his alleged employment agreement with Sheperdstown Hauling & Tree Service, and whether Mr. Clayborn is holding business records of Sheperdstown Hauling & Tree Service that should be turned over to the Debtor.  To determine these issues, the court must first examine the nature of the employment relationship between the Debtor, Sheperdstown Hauling & Tree Service, and Mr. Clayborn, determine whether Mr. Clayborn breached his employment agreement, and then decide whether the Debtor owes Mr. Clayborn unpaid wages.

**A.      The Nature of the Employment Relationship**

No dispute exists that Mr. Clayborn was an employee of Sheperdstown Hauling & Tree Service.[3]  Based on the trial record, the court concludes that Mr. Clayborn was hired on September 15, 2004, as a groundsperson earing $7.00 per hour.  On October 15, 2004, Mr. Clayborn was promoted to company manager earning $10.00 per hour.

On November 1, 2004, Mr. Clayborn received a pay increase to $20.00 per hour based on a 70 hour work week, for a total weekly pay of $1,400.  Mr. Clayborn contends that this represented a new employment contract to be paid a $1,400 weekly salary.  The evidence presented to the court supports Mr. Clayborn's contention inasmuch as the Debtor, as the principal of Sheperdstown Hauling & Tree Service, authorized two payments to Mr. Clayborn based on the $1,400 weekly

---

[3] The parties did not fully develop the trial record concerning whether Sheperdstown Hauling & Tree Service is subject to either the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*., or the Minimum Wage and Maximum Hour standards of the West Virginia Wage Payment and Collection Act, W. Va. Code § 21-5C-1.  Based on the court's review of the limited available facts, however, neither Act applies in this case. *See*  29 U.S.C.S. §§ 203(s)(1)(A), 206(a) (setting, among other things, a threshold of $500,000 in annual gross business revenue before the minimum wage provisions of the Fair Labor Standards Act becomes applicable to an employer); W. Va. Code § 21-5C-1(e) (defining the term "employer" under the Minimum Wage and Maximum Hour Standards of the West Virginia Code to exclude those entities that hire less than 6 employees).

Consequently, neither the minimum wage and maximum hour provisions, nor the delineations between salaried and hourly employees that are set forth in those Acts are applicable to the court's adjudication of this case.

figure.[4]  The Debtor's assertion that he never agreed to pay Mr. Clayborn a $1,400 weekly salary is not credible in light of the two paychecks issued to Mr. Clayborn.

According to Mr. Clayborn, his right to receive a $1,400 weekly salary continued past November 19, 2004.  According to the Debtor, Mr. Clayborn had no right to collect $1,400 per week after November 19, 2004; rather, a new employment agreement was in place where Mr. Clayborn would be paid based on the company's profits after expenses, which were to be split between Mr. Clayborn and the Debtor on a 50-50 basis.

Under West Virginia law, "[w]hen a contract of employment is of indefinite duration it may be terminated at any time by either party to the contract." Syllabus Point 2, *Wright v. Standard Ultramarine & Color Co.*, 90 S.E.2d 459 (W. Va. 1955).  Consequently, an employee working under a contract where the expected duration is never specified is considered to be an "at-will" employee. *Sayres v. Bauman*, 425 S.E.2d 226, 228 (W. Va. 1992).  If the employee contends that he has a permanent employment contract, or some other substantial employment right, then "such claim must be established by clear and convincing evidence." Syllabus Pt. 3, *Adkins v. Inco Alloys Int'l., Inc.*, 417 S.E.2d 910 (1992).

Here, no indication exists that Mr. Clayborn's employment agreement with Sheperdstown Hauling & Tree Service was anything other than an "at-will" relationship.  Although Mr. Clayborn offered an exhibit that purports to be a written employment contract between himself and Sheperdstown Hauling & Tree Service, it has not been admitted into evidence.[5]   Consequently,

---

[4] Ironically, if the Minimum Wage and Maximum Hour Standards of the West Virginia Code were applicable to this case, then Mr. Clayborn would not be classified as a salaried employee. *See supra*, footnote 3. *See also* W. Va. Code § 21-5C-1(f)(6) (allowing employees engaged in bona fide professional, executive, or administrative capacities to be paid a salary).

[5] Mr. Clayborn offered Defendant's Exhibit 2, which purports to be a written employment agreement dated on December 27, 2006, that calls for the Debtor, personally, to pay Mr. Clayborn $1,400 per week as a salary.  As such, Mr. Clayborn is offering the writing to prove its content, which is a contested issue of fact between the parties. The exhibit is a photocopy, with photocopied, handwritten notations. The Debtor denied ever seeing or signing the purported agreement.  Likewise, a former employee of Sheperdstown Hauling & Tree Service, Thomas Clark Drake, who, according to Mr. Clayborn witnessed the signing of the document, denied having any knowledge of it. Under Fed. R. Evid. 1002, to prove the contents

Sheperdstown Hauling & Tree Service had the right to terminate Mr. Clayborn's employment agreement and to change the terms of Mr. Clayborn's employment.

As an at-will employee, Mr. Clayborn could either accept or reject the Debtor's proposal to pay him based on the gross profits of Sheperdstown Hauling & Tree Service. By continuing to work for the company after November 19, 2004, Mr. Clayborn accepted the new employment terms by performance. *Restatement (Second) Contracts* § 19 (1981).

In February 2005, the Debtor told Mr. Clayborn that Sheperdstown Hauling & Tree Service was not making enough money to pay its taxes and the business could not continue. The court construes this statement to mean that the business of Sheperdstown Hauling & Tree Service was terminated, and Mr. Clayborn was no longer its employee. No precise date was offered to the court for the termination of the company's business; thus, the court finds that Sheperdstown Hauling & Tree Service terminated Mr. Clayborn's employment on February 29, 2005.

Of course, Mr. Clayborn continued to perform hauling and tree service work after February 2005. At that time, however, Mr. Clayborn was no longer an employee of Sheperdstown Hauling & Tree Service. The trial record was not well developed as to what type of work Mr. Clayborn performed after February 2005, and what the payment arrangements were, but any work performed after February 29, 2005, was not performed as an employee of Sheperdstown Hauling & Tree Service.

In sum, the court makes the following findings of fact and conclusions of law regarding the nature of Mr. Clayborn's employment history:

    A.    September 15, 2004 to October 14, 2004 - hired by Sheperdstown Hauling & Tree Services as a groundsperson earning $7.00 per hour;

    B.    October 15, 2004 - October 31, 2004 - hired by Sheperdstown Hauling & Tree Service as a manager earning $10.00 per hour;

    C.    November 1, 2004 - November 19, 2004 - hired by Sheperdstown Hauling & Tree Service as a manager at the flat rate of $1,400 per week;

---

of a writing, the original writing is required. The purpose of this rule is to prevent fraud in proving the contents of a writing. Under the circumstances of this case, the court denies admission of Defendant's Exhibit 2 because its admission is not appropriate under Rule 1002.

    D.      November 20, 2004 - February 29, 2005 - hired by Sheperdstown Hauling & Tree Service as a manager to be paid 50% of company profits after expenses;

    E.      February 29, 2005 - terminated as an employee of Sheperdstown Hauling & Tree Service;

    F.      March 1, 2005 - April 2005 - performed specific jobs on his own.

**B.   Mr. Clayborn's Alleged Breach of the Employment Agreement & Retention of Business Records**

The Debtor alleges that Mr. Clayborn breached his employment agreement with Sheperdstown Hauling & Tree Service in that he failed to act as a prudent company manager. Mr. Clayborn, however, was an at-will employee that could be fired for substandard performance by the Debtor – as the principal of Sheperdstown Hauling & Tree Service – at any time. The court is not aware of any cause of action for money damages that the principal of an employer/corporation would have against an at-will employee of the corporation for failing to make the principal's corporation profitable.[6] Moreover, any failure of Mr. Clayborn to be an adequate manager of Sheperdstown Hauling & Tree Service is in direct proportion to the Debtor's exercise of poor judgment in selecting Mr. Clayborn as the company's manager.

When Mr. Clayborn left the employ of Sheperdstown Hauling & Tree Service, he took numerous business records with him. Many, if not all of those records may have been produced by Mr. Clayborn at trial.[7] To the extent that Mr. Clayborn has any additional business records, those records are the property of the Debtor, as the principal of Sheperdstown Hauling & Tree Service. Within 20 days of the entry of this Order, Mr. Clayborn shall return to the Debtor any business records of Sheperdstown Hauling & Tree Service that remain in his possession.

**C.   Mr. Clayborn's Action Against the Debtor for Unpaid Wages**

In Mr. Clayborn's filed proof of claim, he asserts that he is entitled to $42,800 from the Debtor in unpaid wages. The Debtor stated that Mr. Clayborn was an employee of Sheperdstown

---

[6] The court afforded the Debtor an opportunity after the hearing to develop the legal basis for his claim for relief, but the Debtor failed to provide further substantiation of any consequence.

[7] These records were offered, but not admitted, into evidence.

Hauling & Tree Service – not of the Debtor – and that Mr. Clayborn received wages for hourly work for a time, and then was employed under a profit-sharing agreement. Mr. Clayborn has not moved to pierce the corporate veil of Sheperdstown Hauling & Tree Service, and has not otherwise articulated a basis for holding the Debtor personally liable for corporate actions. *E.g.*, *Southern Elec. Supply Co. v. Raleigh County Nat'l Bank*, 320 S.E.2d 515, 523 (W. Va. 1984) ("The law presumes that . . . corporations are separate from their shareholders."). Accordingly, the court believes that the Debtor has rebutted the *prima facie* validity of Mr. Clayborn's filed proof of claim and that it is Mr. Clayborn's burden to prove his entitlement to unpaid wages. *See Stancill v. Harford Sands Inc. (In re Harford Sands Inc.)*, 372 F.3d 637, 640 (4th Cir. 2004) (discussing the burden shifting framework in a claim's objection proceeding).

As stated, Mr. Clayborn was hired by Sheperdstown Hauling & Tree Service on September 15, 2004, as a groundsperson earning $7.00 per hour. On October 15, 2004, he became manager of the company, earing $10.00 per hour. His employment compensation increased to $1,400 weekly for the first two weeks of November 2004. Mr. Clayborn apparently received wage payments as a goundsperson and for his service as a manager from October 15, 2004 through the first week of November 2004 inasmuch as Mr. Clayborn has failed to demonstrate the absence of wage payments during this time.

For the second week of November Mr. Clayborn did not receive his $1,400 weekly pay. The Debtor authorized the company to issue the paycheck, but it was dishonored. As part of a mediation agreement, however, the Debtor paid Mr. Clayborn the net amount of his paycheck on July 8, 2005, and Mr. Clayborn accepted the money as representing the payment of his wages from the second week of November 2004. Having settled his claim for unpaid wages during the second week of November 2004, Mr. Clayborn cannot resurrect it for collection a second time.

Following the second week of November 2004, Mr. Clayborn was employed by Sheperdstown Hauling & Tree Service under a profit-sharing agreement. The uncontradicted testimony of the Debtor established that Shepardstown Hauling and Tree Service never earned a profit due to Mr. Clayborn's failure to price jobs at a level that would be profitable for the company; thus, no monies are due Mr. Clayborn from the second week in November 2004 to the termination of Sheperdstown Hauling & Tree Service's business on February 29, 2005.

After February 29, 2005, Mr. Clayborn did perform additional work, such as for the Debtor's

mother. In performing this work, however, the Debtor was acting on his own – not as an employee of Sheperdstown Hauling & Tree Service. Also, as the Debtor testified at trial, Mr. Clayborn received payment from the Debtor's mother for the work that he performed.

Consequently, the court concludes that Mr. Clayborn has failed to demonstrate his entitlement to an unpaid wage claim against the Debtor's bankruptcy estate. In the end, the court is simply without evidence to reach any other conclusion. As noted before, the record in this case was woefully underdeveloped by the parties including, of course, Mr. Clayborn. Given Mr. Clayborn's self-representation, perhaps that should not be surprising. However, records that a court might expect to receive in an employment dispute as alleged in this case, such as employee wage records or earning statements, company books and ledgers, tax records, and financial statements – including income statements – are absent or not available in an admissible format. The court cannot supply such evidence or provide for relief in its absence. Neither can the court engage in supposition, nor apply unfounded inferences. Even accounting for Mr. Clayborn's *pro se* status, he quite simply has failed to meet his burden of proof by the production of competent evidence.

### III. CONCLUSION

The court will enter a separate order that grants the Debtor's motion to disallow Mr. Clayborn's filed proof of claim, grants the Debtor's request that Mr. Clayborn turnover any business records of Sheperdstown Hauling & Tree Service to him, and that denies all other relief sought by the Debtor.